| | | |
|---|---|---|
| MICHAEL R. MILLER, | ) | |
| | ) | No. 10 C 6533 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| SHERIFF JOHN E. ZARUBA, et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Michael R. Miller was beaten by a fellow prison inmate, Stuart Rothberg, at the DuPage County Jail (the "Jail") while awaiting trial. He later filed suit under 42 U.S.C. § 1983 against officers of the DuPage County Sheriff's Office—Deputy Sheriff Dale Ushman, Sergeant John J. Ryan, Deputy Sheriff Curtis Bryant, Deputy Sheriff Colin Cantwell, Deputy Sheriff Marisa Chavez, and Deputy Sheriff John Ireland (collectively, the "Defendant Officers"—Sheriff John E. Zaruba in his official capacity as administrator of the DuPage County Department of Corrections and the DuPage County Jail, and John Corcoran, M.D., alleging various violations of his constitutional rights. R. 40. He also filed an indemnification count against DuPage County, Illinois. *Id.* The collective Defendants have now moved for summary

---

[1] The Court's citations are to the documents' Docket numbers, as "R. __."

judgment pursuant to Federal Rule of Civil Procedure 56.[2] For the following reasons, the motions for summary judgment are granted in part and denied in part.

## BACKGROUND

Miller was arrested on June 30, 2009, for violating an order of protection that prohibited him from having contact with his wife. R. 40 ¶ 10. Villa Park, Illinois police officers took him to the DuPage County Jail, where he was detained until November 17, 2010, because he was unable to post bond. *Id.* Miller was originally housed in the misdemeanor "pods" of the Jail. *Id.* ¶ 11. These pods are "fashioned like barracks, and inmates are free to move about the pod[s], socialize, and make phone calls." *Id.* However, after Miller made a number of "reconciliatory phone calls to his estranged wife," *id.* ¶ 12, a judge revoked Miller's phone privileges at a hearing on July 22, 2009, and Miller needed to be moved to a pod where no calls could be made. *Id.* ¶ 13; R. 80 ¶ 23.

Because the original pod Miller had been staying in allowed the inmates to make phone calls, officers placed Miller in Cell #1 of the "1-T administrative segregation pod," (the "1-T pod"), because phone usage can be restricted there. R. 80 ¶¶ 22-23; R. 84 ¶¶ 1, 3. The 1-T pod also allows certain inmates to be "segregated" from other inmates for a variety of reasons, including medical, psychological, emotional, and security concerns. R. 80 ¶ 5. Only supervisors and medical staff determine who is housed in the 1-T pod. *Id.* ¶ 8; R. 84 ¶ 8.

---

[2] The Defendant Officers, Zaruba, and DuPage County, Illinois, filed a single motion for summary judgment, R. 68; Dr. Corcoran filed his own. R. 72.

To keep track of which inmates are to remain separated, the Jail uses a "wristband" system that assigns colors to certain restrictions on inmates: yellow for a "separation" issue; red for a "medical" issue; orange for a "medical/separation" issue; and blue for "no restrictions." R. 80 ¶ 6. A yellow wristband indicating "separation" does not "*automatically* mean separation of one named inmate from all other inmates" at the Jail. *Id.* ¶ 15. It could simply mean that one named inmate is to remain separated from another named inmate, *id.*, as inmates at the Jail can specifically request to be placed on separation from other inmates. *Id.* ¶ 9. While Miller was housed in the 1-T pod, he filed numerous grievances, some specifically requesting that the Jail move him from the 1-T pod because he was there "on a non-violent misdemeanor," was "not insane," and was housed with much more dangerous criminals. R. 82, Exh. 13. Miller never specifically requested in a grievance to be separated from Rothberg. *See id.*

Inmates in the 1-T pod are only allowed out of their cells "one at a time" to go to the day room; this is done to prevent "separated'" inmates from encountering one another. R. 82, Exh. 7, 24:14-25:1. Inmates are often allowed, however, to go to the gym together under supervision. R. 80 ¶ 21. For example, inmates with yellow wristbands can go to the gym with other inmates, provided the inmate does not have a specific separation restriction from an inmate already in the gym. *Id.* ¶ 16. Inmates with orange or red wristbands are prohibited from entering the gym under any circumstance. R. 82, Exh. 1, 70:16-18. Every day, an updated "separation list" is

prepared and placed at each "post," so officers can confirm which inmates are to remain separated from others. R. 80 ¶ 13.

With this backdrop in place, the Court discusses the allegations of Friday, October 23, 2009. That day, Ushman was working "Three Floor Control (a.k.a. Three Housing Control)," the post where the officer "oversees and controls the flow of traffic through the corridors [of a pod] through opening and closing of sliding doors" and is "responsible for observing the inmates in the gym area." R. 84 ¶¶ 11, 13. At some point, Miller and a fellow inmate, Rothberg, were both escorted to the gym area. R. 80 ¶ 29. The record is unclear as to whether Miller and Rothberg were escorted to the gym at the same time or separately, *see* R. 82, Exh. 8, 141:18-20, though Miller alleges that Rothberg entered the gym after him. *Id.* at 173:7-9. The record is also unclear as to who escorted the inmates to the gym that day. Miller contends that Cantwell escorted him there; Cantwell does not remember doing so.[3] *Compare* 84 ¶ 17, *with* R. 82, Exh. 3, 30:3-8. Regardless, before inmates are escorted from the housing area to the gym area, officers are required to check the color of the inmates' wristbands, as well as the updated separation list, to make sure that inmates are not improperly placed in the same area together. *See* R. 82, Exh. 1,

---

[3] The parties have not addressed who escorted *Rothberg* to the gym. However, if Cantwell escorted Miller to the gym, a reasonable inference drawn in Miller's favor is that Cantwell also brought Rothberg to the gym. *See* R. 82, Exh. 9, 139:8-11, 40:16-24 (*Question*: Did you have prior contact with Deputy Cantwell prior to October 23, 2009? *Answer*: I think he was the one who walked us to the gym. . . . *Question*: What about before the incident? Is there anything you're complaining about regarding Deputy Cantwell that you saw him do? *Answer*: I believe that he was the one that let Rothberg in.).

69:6-70:18. Miller testified that Cantwell checked the inmates' wristbands that day before the inmates were escorted to the gym. R. 82, Exh. 8, 141:3-17. Whether the officer working the Three Floor Control post is required to also do a wristband/separation list check is unclear from the record. *Compare* R. 82, Exh. 1, 70:6-18, *with* R. 82, Exh. 12, 28:4-16. Also unclear is the color of Rothberg's wristband on October 23, 2009—Miller believes it was orange; the Defendant Officers contend it was yellow.[4] R. 80 ¶ 18; R. 84 ¶ 17.

Miller and Rothberg were in the gym that day with approximately four or five other inmates, each of whom lived in a different pod than Miller and Rothberg. R. 82, Exh. 9, 126: 3-15. Miller contends Rothberg's behavior in the first five to ten minutes they were in the gym together was alarming. *Id.* at 72:18-73:5. According to Miller, Rothberg "was pacing back and forth talking to himself, incoherently," "picking dust balls up off the ground and eating them," and "[s]haking his fists." *Id.* at 72:6-24. No officer was physically present in the gym with the inmates, so Miller tried to relay his observations of Rothberg to Ushman via the intercom system. R. 84 ¶ 18. Miller attempted to express his fears to Ushman until the conversation was cut short before Miller could do so. *Id.* ¶¶ 18-21. Miller says Ushman told him to "hold on a minute" and walked away; Ushman says the "conversation was cut off." R. 82, Exh. 9, 145:6-14; Exh. 12, 32:2-18. Then, at about that time, Rothberg

---

[4] Miller does not explicitly remember (or allege) what color wristband he was wearing on October 23, 2009. *See* R. 82, Exh. 9, 63:5-8. Because Miller was not on separation from anyone else at the time and he was given a yellow wristband after the attack, *see* R. 82, Exh. 14, one can reasonably infer that Miller was wearing a blue wristband before the attack. *See, e.g.*, R. 82, Exh. 1, 52:10-53:4; Exh. 4, 36:21-37:5; Exh 7, 46:23-47:9.

attacked Miller and started kicking and punching Miller in the head. R. 84 ¶ 21. Ushman noticed the altercation when he turned from the monitor to investigate why Miller had stopped speaking—Ushman was originally unable to see Miller because of the placement of the intercom system in the gym and the location of Ushman's post. *Id.* ¶¶ 19-21.

Ushman immediately called out for assistance via the radio to say a fight had broken out in the 3A floor control gym. *Id.* ¶ 22. Within two minutes or so, other officers in the Jail arrived at the gym to break up the fight. R. 80 ¶ 38; R. 84 ¶ 24. Ushman remained at his post while some officers separated Miller and Rothberg and others cleaned up the scene. R. 84 ¶ 24. Miller claims the attack left him "bleeding profusely from his face, scalp, and mouth," and that he had a broken nose, fractured teeth, and possibly a concussion or a skull fracture. *Id.* ¶¶ 42-43. Ushman authored a report regarding the incident, in which he listed the Defendant Officers as witnesses. The report also stated, "A yellow wristband was placed on inmate Miller; inmate Rothberg already had a yellow wristband." R. 82, Exh. 14.

Officers brought Miller to see Dr. Corcoran after the fight, as Dr. Guzman, the Jail's doctor, was not at the Jail that day. R. 81 ¶ 8. Dr. Corcoran is a licensed psychiatrist who provides psychiatric services to inmates at the Jail. R. 81 ¶ 5. He is also a licensed medical doctor who is qualified to examine inmates with medical concerns. R. 80 ¶ 48.

Dr. Corcoran examined Miller, ordered medications for pain, and arranged for Miller to see Dr. Guzman, three days later on the following Monday, October 26.

R. 81 ¶ 16. On that day, Dr. Guzman examined Miller, placed him on "neuro check" due to a "questionable concussion," and ordered an x-ray of Miller's nose. *Id.* ¶ 20. He also continued Dr. Corcoran's prescription for pain medication. *Id.* ¶ 21. Miller had an x-ray taken of his nose and face two days later, on October 28; the x-ray was negative. *Id.* ¶¶ 22-23. Miller saw the Jail dentist, Dr. Cusack, on November 2. R. 81 ¶ 26. Dr. Cusack gave Miller medication but did not provide any additional treatment for Miller's chipped teeth. *Id.*

On October 12, 2010, Miller filed this action against Zaruba, "Unknown DuPage County Defendants," Ushman, Dr. Corcoran, and DuPage County. R. 1. All of the Defendants filed motions to dismiss, *see* R. 7; 23, which the district court granted in part.[5] R. 31. Miller filed his Amended Complaint on October 19, 2011, which included all of the named Defendants at issue here. Following the close of discovery, the Defendants filed motions for summary judgment. R. 68; 72.

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, the non-moving party must produce more than a "mere scintilla of evidence," meaning "evidence on which [a] jury could reasonably find for the non-moving party." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (2013) (citing *Anderson v. Liberty*

---

[5] The case was previously before District Judge Virginia M. Kendall. R. 88.

*Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In ruling on the motion, the Court considers the entire evidentiary record and "view[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013); *Egan Marine Corp. v. Great Am. Ins. Co.*, 665 F.3d 800, 811 (7th Cir. 2011).

## ANALYSIS

Miller's Amended Complaint includes five counts: Count I, against the Defendant Officers and under § 1983, alleges a failure to protect; Count II, also against the Defendant Officers and under § 1983, alleges a failure to intervene. Count III, against Dr. Corcoran and under § 1983, alleges that Dr. Corcoran was deliberately indifferent to Miller's serious medical needs.[6] Count IV is a § 1983 *Monell* claim against Sheriff Zaruba in his official capacity as administrator of the DuPage County Department of Corrections and the DuPage County Jail, which includes various "policy, practice, or custom" allegations.[7] Count V is an indemnification claim against DuPage County pursuant to 745 ILCS 10/9-102. Each of the Defendants contends, for a variety of reasons, that there is insufficient

---

[6] Miller was a pretrial detainee at the time of the conduct at issue, so his deliberate indifference claims "arise[] under the Fourteenth Amendment's Due Process Clause but [are] governed by the same standards as a claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013).

[7] The Amended Complaint does not explicitly make clear that it is brought against Zaruba in his individual capacity. Thus, the Court will only construe the Amended Complaint as being against Zaruba in his official capacity. *See Guzman v. Sheahan*, 495 F.3d 852, 860 (7th Cir. 2007).

evidence for a reasonable jury to conclude they violated Miller's constitutional rights. The Court addresses each count in turn.

### A. Count I - Failure to Protect

To state a § 1983 claim for failure to protect, Miller must establish the following: (1) "he was 'incarcerated under conditions posing a substantial risk of serious harm,'" and (2) "the defendants acted with 'deliberate indifference' to his health or safety." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Miller believes the first element is satisfied because he was allowed to be in the gym with Rothberg, an inmate he claims had an orange wristband and "was restricted from mixing with other inmates in the gym" as a result of his medical and violent personal history. R. 78 at 13; R. 84, ¶¶ 29, 30, 33-35. The Court must therefore determine whether a jury could find Miller and Rothberg being in the gym together presented a substantial risk of serious harm to Miller.

The issue boils down to whether a jury believes Rothberg was known to be dangerous (in hindsight, he was), and the evidence here is conflicting. Miller contends that Rothberg was known as "being odd" and "had incidents with inmates and staff." R. 84 ¶ 30; *see, e.g.*, R. 82, Exh. 9, 62:13-63:21, 64:4-24, 71:19-24. To support this, he highlights the testimony of Denise D. Stephenson, R.N., who said that Rothberg, at one point, had a red wristband because he "was not emotionally fit and [had] to be placed in an area where he wouldn't hurt others or himself." R. 82, Exh. 11, 49:10-13. The Defendant Officers claim ignorance of that information. *See,*

*e.g.*, R. 80 ¶¶ 20, 26, 34-36. Miller also claims that Rothberg was wearing an orange wristband, a step down from red but still highlighting a more significant risk to others, on the day of the attack. R. 80 ¶ 18; R. 84 ¶ 17. Conversely, the Officer Defendants claim that Rothberg had a yellow wristband, *id.*, which would have made his placement with Miller in the gym permissible under the wristband system. R. 80 ¶ 16. The Officer Defendants also claim that Miller never saw Rothberg act in a violent manner, Rothberg never threatened Miller prior to the incident, and Rothberg and Miller had been at the law library together at the same time on a different day and nothing happened between them. *Id.* ¶¶ 24, 25, 27.

Despite the Officer Defendants' assertions, a jury could conclude that Rothberg was a dangerous inmate for a number of reasons: his reputation, his prior wristband and inmate-incident history, and whether he had an orange wristband on the day of the attack. Thus, Miller has provided sufficient evidence for a reasonable jury to believe that Rothberg was a dangerous inmate, which allows for the inference that Miller being in the gym with Rothberg presented a substantial risk to Miller's health or safety. This is enough for the first element.

The next issue the Court must address is who knew about the risk, and who allegedly failed to take action if they knew of it. This element, the subjective component of the alleged offense, is the crux of the debate regarding Count I. *See Pavlick v. Mifflin*, 90 F.3d 205, 210 (7th Cir. 1996) (explaining that "[i]n failure to protect cases, the debate often exclusively concerns what the prison official knew and when he knew it"). The Seventh Circuit has stated that "failure to provide

protection constitutes a [constitutional] violation only if deliberate indifference by prison officials to a prisoner's welfare 'effectively condones the attack by allowing it to happen.'" *Santiago*, 599 F.3d at 756 (quoting *Lewis v. Richards*, 107F.3d 549, 553 (7th Cir. 1997)). In other words, prison guards are not expected to perform their prison duties "flawlessly," and mere negligence will not suffice to impose liability on an officer. *See Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004). Miller must demonstrate the Defendant Officers "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago*, 599 F.3d at 756 (internal quotation marks omitted).

In Miller's response to the collective Defendants' motions for summary judgment, Miller fails to state how each particular Defendant Officer was deliberately indifferent to his safety. Rather, he continually refers to the group as "DuPage Defendants" or "DuPage County Jail Officials" and never specifically explains how or why any single officer had the subjective mental state required to satisfy the second element. *See* R. 78 at 14-17. This is problematic: "Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants." *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). Accordingly, if at the summary judgment stage Miller is unable to put a particular defendant at the scene of the alleged improper conduct or establish that defendant had any knowledge of what

was occurring, he surely cannot establish the mental state required of the defendant. And therefore, that defendant must be dismissed.

Here, the only individual defendants who Miller has specifically alleged to be at the scene or have anything to do with Miller and Rothberg's placement in the gym together are Ushman and Cantwell. The uncontroverted testimony is that the other officers named in the Amended Complaint—Ryan, Bryant, Chavez, and Ireland—did not have any contact with Miller or Rothberg, or arrive at the gym or in the gym's vicinity, until after Ushman placed a call saying there was a fight. *See* R. 84 ¶ 24. By that point, the "failure to protect" constitutional violation that was alleged had long since occurred. Miller has not put forth any evidence demonstrating Ryan, Bryant, Chavez, or Ireland had anything to do with bringing Rothberg or Miller to the gym, permitting them to be in the gym together, or observing them while they were in the gym. Without any evidence of that, a reasonable jury could not conclude they were deliberately indifferent to Miller's safety and welfare. *See Guzman*, 495 F.3d at 860 (holding that the defendant officer could not be deliberately indifferent where there was no evidence of "actual awareness" on his part—i.e., that he "*actually* knew of a substantial risk of serious harm and consciously disregarded it nonetheless") (internal quotation marks omitted) (emphasis in original). For that reason, Count I fails against Ryan, Bryant, Chavez, and Ireland. The Court's focus shifts to Ushman and Cantwell.

### 1. Ushman

Beginning with Ushman, the uncontroverted evidence establishes he was assigned to the "Three Floor Control" and responsible for "oversee[ing] and controll[ing] the flow of traffic through the corridors and through opening and closing of sliding doors," as well as "observing the inmates in the gym area." R. 84 ¶ 11. Neither party disputes that. *Id.* The parties quarrel over a responsibility central to this case: whether Ushman, while serving at that post, was responsible for checking the wristbands of the inmates who passed by his booth. Ushman testified that inmates' wristbands are not checked at his post, as that happens when the inmates leave their housing area. R. 82, Exh. 12, 28:4-16. Conversely, Sergeant Mark Boggs testified to the following:

> The deputies sending the inmates from the housing area are supposed to review their separation list for the inmates they are actually sending
> And then, also, the receiving deputy working the gym area or the floor control *should also check to make sure if they have knowledge of who is in there and if there is any separation issues.*
> And that's where it resorts back to the wristbands, too. . . . The floor control deputy will open the doors, allow them to enter the gym and *the deputy should be monitoring that everybody coming in . . . has a wristband on that would allow them to come to the gym.*

R. 82, Exh. 1, 69:16-70:10 (emphasis added). The uncontroverted evidence is that Ushman had an updated list of inmates who were on "separation" and could have consulted the list to determine whether Miller and Rothberg were precluded from being in the gym together.[8] R. 80 ¶ 11-13.

---

[8] If Rothberg had an orange wristband, the list should have reflected that he was to remain separated from all the other inmates. There was no specific "separation" designation for only Miller and Rothberg before the attack. *See* R. 80 ¶ 19.

So with respect to Ushman, at least two prominent issues of material fact exist. The first, as discussed, is whether Rothberg was wearing an orange wristband. That question goes to the substantial risk issue. The second is whether Ushman was required to verify the wristband colors (or should he have anyway) before allowing Miller and Rothberg into the gym. If so, the determinative issue is whether Ushman was deliberately indifferent to the risk if he was required to check the wristbands before letting Rothberg and Miller into the gym together and, yet, neglected to do so. An answer in the affirmative to the first two questions would allow a reasonable jury to conclude Ushman was deliberately indifferent to Miller's health and safety. It would show that Ushman knew or should have known of a known risk (Rothberg's violent or unstable nature) and intentionally or recklessly disregarded it (failed to comply with his responsibility of checking wristbands, which could put the wrong people together at the wrong time). *See Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("If the prison officials know that there is a cobra [with the inmate] or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference.") (internal quotation marks omitted).[9] On the other hand, a jury could also determine that any failure to check the wristbands was the result of mere negligence—e.g., Ushman was not paying attention at the time or simply forgot—which would not suffice for liability under § 1983. Thus,

_____

[9] The Court is careful to note, however, that a violation of a Jail policy or procedure does not automatically mean there was a violation of Miller's constitutional rights. *See Mann v. Vogel*, 707 F.3d 872, 882 (7th Cir. 2013) ("[A] violation of state procedures does not automatically equate to a violation of [the plaintiff's constitutional rights].").

because issues of material fact exist regarding these questions, summary judgment as to Ushman on Count I is denied.

To the extent Count I can be interpreted as alleging that Ushman could have done more *at the time of the fight*, this claim cannot succeed at trial. Ushman was the only person observing the gym when Rothberg attacked Miller. R. 84 ¶ 13. "A prison guard, acting alone, is not required to take the unreasonable risk of attempting to break up a fight between two inmates when the circumstances make it clear that such action would put [him] in significant jeopardy." *Guzman*, 495 F.3d at 858. Ushman followed proper procedures in calling for backup, which arrived within two minutes or so. R. 80 ¶¶ 37-38; R. 84 ¶¶ 22-24. This conduct did not even constitute negligence; a jury could certainly not characterize it as deliberate indifference.

### 2. Cantwell

Similar issues of material fact exist at to Cantwell. The record is unclear as to what particular role Cantwell played in the events on October 23, 2009. Cantwell, to the best of his memory, does not believe he saw either Miller or Rothberg on the date in question. R. 82, Exh. 3, 30:3-8. He testified that he was one of the last officers to arrive at the gym, and both inmates were gone by the time he responded to the call. *Id.* at 29:11-19. Miller disputes this, contending that Cantwell checked the color of the inmates' wristbands before they went to the gym, R. 82, Exh. 8, 141:3-17, and that Cantwell personally escorted him from the housing area to the gym. R. 84 ¶ 17. Miller also testified that Cantwell let Rothberg into the gym. S*ee* R.

82, Exh. 8, 140:16-19. These contentions, despite the Defendant Officers' characterization of them as self-serving, are enough to create a question of fact as to whether Cantwell was the person who escorted Miller and Rothberg to the gym or ultimately allowed them to be in the gym together. *See United States v. Funds in the Amount of $100,120.00*, No. 11-3706, ___ F.3d ___, 2013 WL 5273301, *4 (7th Cir. Sept. 19, 2013) ("To reject testimony because it is unsubstantiated and self-serving is to weigh the strength of the evidence or make credibility determinations—tasks belonging to the trier of fact."). A jury could believe Miller's testimony, just as it could believe Cantwell's testimony. The only other person alleged to be at the door where Rothberg and Miller were let in together was Ushman, and he testified that he does not know who escorted the inmates or who checked their wristbands at the 1-T pod. R. 82, Exh. 12, 62:18-63:4. Furthermore, as previously stated, neither party has stated who escorted Rothberg to the gym or whether Rothberg and Miller were escorted together. *See* R. 82, Exh. 8, 140:21-24 (*Question*: Was Rothberg with your [Miller's] group when you were escorted to the gym or was he in a different group? *Answer*: I can't recall.). These questions are for the trier of fact to resolve.

That brings the Court to the next issue: assuming for summary judgment purposes that Cantwell escorted Miller and/or Rothberg, whether Miller put forth evidence supporting a finding that Cantwell was deliberately indifferent to a known risk when he allowed the men to be in the gym together. The Court believes so.

The Court has already discussed the factual dispute regarding the color of Rothberg's wristband on October 23, 2009. That same dispute applies to the subjective element regarding Cantwell's alleged conduct. Assuming Rothberg's wristband was orange and any of the these possibilities is true—(1) Cantwell escorted Miller to the gym first, and then Cantwell escorted Rothberg; (2) Cantwell escorted Miller and Rothberg to the gym contemporaneously; or (3) Cantwell had a role in checking wristbands at the pods and allowed someone to escort Rothberg to the gym—a jury could conclude that Cantwell knew, or was at least reckless by not knowing that bringing an inmate with an orange wristband (Rothberg) to spend time in the gym with another inmate already in the gym (Miller) created a dangerous situation. A jury could also conclude that Cantwell knew, or was at least reckless by not knowing that allowing another officer to escort an inmate who he knew had an orange wristband (Rothberg) to spend time with an inmate already in the gym (Miller) created a dangerous situation. *See McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (explaining that deliberate indifference is "essentially a criminal recklessness standard, that is, ignoring a known risk"). This is not like the situation where a prison official chooses one course of action over another to mitigate a risk, which does not amount to a constitutional violation. *See Fisher v. Lovejoy*, 414 F.3d 659, 662-63 (7th Cir. 2005). Here, if the jury believes that Cantwell ignored the only, and *required*, course of action under the circumstances (not escorting an inmate with an orange wristband to the gym or allowing another to escort an inmate with an orange wristband to the gym, *see* R. 82, Exh. 1, 70:16-18), that

finding would support a claim for deliberate indifference. Summary judgment on Count I as to Cantwell is denied.[10]

## B. **Count II - Failure to Intervene**

An officer may be liable under § 1983 for a failure to intervene if "any constitutional violation has been committed by a law enforcement official[,] *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (emphasis in original).

Initially, as the Court concluded regarding Count I, Miller has not put forth any evidence that Ryan, Bryant, Chavez, and Ireland had anything to do with Miller and Rothberg being escorted to the gym together, put in the gym together, or allowed to remain in the gym together. Miller also has not put forth any evidence that Ryan, Bryant, Chavez, and Ireland even knew Miller and Rothberg were in the gym together. As such, Miller cannot establish that they knew a constitutional violation had been committed or that they had a realistic opportunity to prevent it. His failure to intervene claim against these Defendants fails at the start.

With only Ushman and Cantwell remaining as to Count II, the Court moves to the specific "failure to intervene" allegation: Ushman and Cantwell were deliberately indifferent to Miller "when they left Mr. Rothberg, Mr. Miller, and other inmates unsupervised and unobserved in the gym" and failed to monitor the

---

[10] The evidence and inferences in Miller's favor are slight with respect to Cantwell. Absent proof at trial that Cantwell had anything to do with Rothberg's placement in the gym or had knowledge of Rothberg having an orange wristband (if he indeed had one), there may be a directed finding in favor of Cantwell.

inmates' behavior, which prevented them from taking note of Rothberg's behavior and preventing the attack. R. 40 ¶¶ 44-45. This allegation is different than most failure to intervene claims. Generally, a failure to intervene claim applies when an officer does not prevent another officer from falsely arresting someone or using excessive force. *See, e.g.*, *Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008). Nonetheless, Miller has provided sufficient evidence to support a failure to intervene claim against Ushman and Cantwell.

The Court's commentary regarding Count I against Ushman and Cantwell is the foundation for its conclusion here. Factual disputes exist as to the role Ushman and Cantwell had regarding Rothberg and Miller being in the gym together, as well as who was responsible—possibly both—for checking the wristbands of the inmates before allowing them to be in the gym together. The underlying dispute as to the color of Rothberg's wristband also is a central issue. But questions of material fact just satisfy Miller's burden as to the first element, i.e., whether there was a constitutional violation by a prison official. He must also provide evidence that the defendant officer had a realistic opportunity to prevent the harm from occurring.

The Seventh Circuit has stated that a "'realistic opportunity to intervene' may exist whenever an officer could have 'called for a backup, called for help, or at least cautioned the [officer committing the alleged constitutional violation] to stop.'" *Abdullahi*, 423 F.3d at 774 (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). This determination most often involves a question of fact: "Whether an officer had sufficient time to intervene or was capable of preventing the harm

caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonably jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997). And the same is true here.

If the jury were to find a constitutional violation, either by Ushman or Cantwell, the jury could also conclude that the other officer could have stopped it. For example, the jury could find that Cantwell was deliberately indifferent by failing to recognize that Rothberg had an orange wristband and escorting him into the gym where other inmates could be. The jury could then find that Ushman's position in the control booth gave him a realistic opportunity to prevent this from happening, which according to the disputed facts, he may have been required to do. *Compare* R. 82, Exh. 1, 69:16-70:10, *with* R. 82, Exh. 12, 28:4-16. The reverse could happen as well. The jury could find that Ushman was deliberately indifferent by allowing Rothberg and Miller to be in the gym together, and that Cantwell had a realistic opportunity to prevent it from happening, as he was the officer who allegedly checked Miller and Rothberg's wristbands at the 1-T pod and then escorted Miller, and possibly Rothberg, to the gym. *Compare* R. 82, Exh. 3, 30:3-8, *with* R. 84, ¶ 17; *see* R. 82, Exh. 8, 141:1-20.

Taken together, Miller has established there are genuine issues of material fact as to the failure to intervene claim against Ushman and Cantwell. He has not done so as to Ryan, Bryant, Chavez, and Ireland, so Count II against those four officers is dismissed.

### C.  Count III - Deliberate Indifference to Miller's Medical Needs

Miller contends that Dr. Corcoran's treatment of him after the attack constitutes deliberate indifference to his serious medical needs. Like the failure to protect claim, Miller must satisfy two elements to establish a deliberate indifference claim premised upon inadequate medical treatment: an objectively serious risk of harm and a subjectively culpable state of mind. *Farmer*, 511 U.S. at 834; *see Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

For a medical condition to satisfy the objective element, the condition must be "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). The condition need not be life-threatening to be serious, however; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."  *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  To satisfy the subjective element, Miller must demonstrate that Dr. Corcoran knew of a substantial risk of harm to Miller and either acted or failed to act in disregard of that risk. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). As a medical professional, Dr. Corcoran is "entitled to deference in [his] treatment decisions unless no minimally competent professional would have so responded under [the] circumstances at issue." *McGee*, 721 F.3d at 481 (internal quotation marks omitted). In other words, "[a] jury can infer deliberate indifference on the basis of [Dr. Corcoran's] treatment decision [when] the decision [is] so far

afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (internal quotation marks omitted). Neither medical malpractice nor a mere disagreement with his medical judgment will suffice. *See Greeno*, 414 F.3d at 653.

The Court first turns its attention to the objective element—i.e., whether Miller suffered from a serious medical need. Miller contends that he was knocked unconscious as a result of the attack and was "bleeding profusely from his face, scalp, and mouth," as well as had a broken nose, fractured teeth, and possibly a concussion or a skull fracture. R. 84 ¶¶ 42-43. Dr. Corcoran disputes this characterization of Miller's injuries and argues that "chipped teeth alone are not sufficient to constitute a serious medical need." *Id.*; R. 73 at 3. In support, Dr. Corcoran directs the Court to the fact that "there was no evidence of an acute fracture or dislocation of [Miller's] nose" or of "multiple tooth fractures" when Miller was examined at Central DuPage Hospital five days after the attack. R. 84 ¶ 46. The Court agrees that the later findings, which confirm Dr. Corcoran's initial diagnosis, are relevant to the question of deliberate indifference. But later findings are not necessarily indicative of whether a condition was serious at the time of *presentment*. Here, officers would not have taken Miller to a doctor if he did not appear to be hurt after the attack. *See McGee*, 721 F.3d at 480 (explaining that an inmate's condition is serious if "even a lay person would perceive the need for a doctor's attention"). And numerous courts have found medical conditions less dire

than that complained of by Miller to satisfy the "objectively serious" element. *See, e.g.*, *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1067, 1072 (7th Cir. 2012) (left leg "pain"); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (tooth decay); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (nasal fracture); *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Medical conditions much less serious than seizures have satisfied the [objective] standard."). Accordingly, Miller has put forth sufficient evidence for a jury to conclude he presented to Dr. Corcoran with a serious medical need.

The next issue is whether a jury could conclude Dr. Corcoran's treatment of Miller constitutes deliberate indifference. The answer is no. Initially, this is not a case in which a physician completely ignored Miller's pain and complaints. *Cf. Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). Miller does not dispute that Dr. Corcoran examined him, prescribed Tylenol 975 mg and Motrin 800 for his pain (which Miller received), and arranged for a follow-up appointment with Dr. Guzman on the next day Dr. Guzman was to be at the jail. R. 81 ¶¶ 12-16. Rather, Miller believes the treatment he received was insufficient under the circumstances. R. 78 at 7-12. The problem for Miller is he must put forth evidence that Dr. Corcoran's treatment was beyond the bounds of a proper course of treatment and *blatantly* inappropriate. *See Berry*, 604 F.3d at 441; *Greeno*, 414 F.3d at 653-54. Yet, the evidence proffered supports the exact opposite conclusion.

For instance, Dr. Guzman continued Dr. Corcoran's order for Miller to continue receiving pain medication. R. 81 ¶ 21. An x-ray taken of Miller's nose and

face "revealed that there was no definite evidence of an acute fracture or dislocation of [Miller's] nose." *Id.* ¶ 23. Dr. Cusack, the jail dentist, examined Miller's chipped teeth and gave Miller Doxycycline 150 mg and Motrin 800 mg; he did not provide any additional treatment for Miller's teeth. *Id.* ¶ 26. And tellingly, Miller has not received any subsequent treatment for his nose or teeth and does not have any complaints about the care and treatment provided to him by Dr. Guzman and Dr. Cusack. *Id.* ¶¶ 26-29. In fact, Miller has not submitted any medical testimony or evidence that is even critical of Dr. Corcoran's treatment on October 23, 2009. If Miller is unable to establish that Dr. Corcoran's treatment constituted malpractice, it necessarily follows that he is precluded from demonstrating Dr. Corcoran was deliberately indifferent.

One can interpret Miller's complaints against Dr. Corcoran as invoking the rationale behind certain deliberate indifference claims, that is, "[a] significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Grieveson*, 538 F.3d at 779. However, Miller has not put forth evidence demonstrating that any "seizure disorder, vertigo, facial pain, [or] vision problems" from which he may now suffer had anything to do with Dr. Corcoran (1) not ordering an x-ray on October 23, 2009; (2) not immediately sending Miller to the emergency room; or (3) not putting Miller on "neuro check" for a concussion at that time. R. 84 ¶ 27; *see Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007) ("[A] plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental."). That Dr.

Guzman may have taken additional steps in response to Miller's condition three days later hardly establishes deficient medical care, let alone deliberate indifference. *See Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field."); *see also Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."). And in any event, Miller has not even put forth evidence that he *actually suffered* a concussion or a broken nose. Any delay alleged here can only be described as trivial. *Cf. Grieveson*, 538 F.3d at 779-80.

Finally, between the time Miller saw Dr. Corcoran and when he saw Dr. Guzman, Miller "was visited and administrated [sic] medications by the Jail's nurses on five (5) occasions over the weekend – once on Friday, October 23, 2009, and twice both on Saturday, October 24, 2009 and Sunday, October 25, 2009." R. 81 ¶ 17. It was not as if Dr. Corcoran completely ignored Miller's complaints or put him in a situation where he would not be monitored in the event his symptoms worsened. *See* R. 80 ¶¶ 50-51. Miller does not dispute that "[m]edical services are available at the DuPage County Jail twenty-four (24) hours per day, seven (7) days a week" or that he "was seen by medical staff through the weekend following the October 23, 2009 incident with Rothberg." *Id.*; c*f. King*, 680 F.3d at 1019.

Miller says "Dr. Corcoran examined [him] for just moments and essentially rendered him no diagnosis, treatment or plan for further care," R. 78 at 9, but the

uncontroverted evidence says otherwise. A reasonable jury could not find in Miller's favor on the second, subjective element; therefore, summary judgment in favor of Dr. Corcoran on Count IV is appropriate.

### D. Count IV - *Monell* Claims

Count IV is a cause of action under *Monell* against Zaruba in his official capacity as Sheriff of DuPage County. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Klebanowski v. Sheahan¸* 540 F.3d 633, 637 (7th Cir. 2008) (explaining that "[a]n official capacity suit is tantamount to a claim against the government entity itself") (alteration in original). Respondeat superior does not apply to § 1983 claims, *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012), but a government entity may still be liable for a § 1983 violation "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a 'wide-spread practice' that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with 'final decision policymaking authority.'" *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) (quoting *McTigue v. City of Chi.*, 60 F.3d 381, 382 (7th Cir. 1995)). A plaintiff must demonstrate that the "official policy or other governmental custom . . . not only cause[d] but [was] the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012).

Miller does not expressly invoke any one of the three policy types in his Amended Complaint, arguing only that five "policies, practices, or customs" manifest deliberate indifference to the health and safety of inmates at the Jail:

(1) failing to adequately train, supervise, and control his employees;

(2) forcing inmates without psychiatric or violent tendencies to be housed together with and to interact unsupervised with inmates that are known to have psychiatric problems and violent tendencies;

(3) delegating the diagnosis and treatment of physical trauma to a psychiatrist rather than a medical doctor specialized in the diagnosis and treatment of physical trauma;

(4) providing insufficient and inadequate medical staffing at the DuPage County Jail on weekends to handle serious medical emergencies; and

(5) providing insufficient and inadequate staffing and training of Deputy Sheriffs in the gym control booth to effectively observe and control inmates.

R. 40 ¶ 56. Because Miller has not directed the Court to any express policy causing the alleged constitutional violations or offered evidence that Zaruba caused the circumstances of which he complains, Miller must demonstrate that the polices alleged were "widespread practices" in the jail. *See Klebanowski*, 540 F.3d at 637-38.

The Court begins its analysis by looking to Miller's contention that the Jail has a widespread practice of failing to adequately train, supervise, and control its employees. In doing so, the Court can easily reject this generalized allegation because Miller does not even address it in his combined response. *See* R. 78 at 18-19. This may have been a strategic choice because Miller does not dispute that he

27

"has no knowledge of the 'training and supervision' in place at the DuPage County Jail" or that he "has no knowledge as to his allegations as to 'failure to properly train or supervise' the individual deputies named in this lawsuit." R. 80 ¶ 52. But no matter the reason, all of the individuals named in this suit have received training regarding their duties and responsibilities, R. 80 ¶¶ 53, 56, 61, 69, 73, 77, and Miller has not put forth anything that might be thought to support the allegation. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) ("Palmer's claim fails because he did not present so much as a scintilla of evidence that the defendants improperly hired, trained, or supervised the Mario County Jail's staff."). Miller's allegation regarding an institutional failure to train, supervise, or control in the Jail is completely without merit.

Miller's second allegation, that the Jail forces "inmates without psychiatric or violent tendencies to be housed together with and to interact unsupervised with inmates that are known to have psychiatric problems and violent tendencies," R. 40 ¶ 56b, also fails. There is no dispute here that the DuPage County Jail has a classification system to determine where inmates are to be housed and a wristband system that serves as a system to identify certain separation restrictions on inmates. R. 80 ¶¶ 4-6. Factors considered for wristband designation include medical, psychological, emotional, and security concerns. *Id.* ¶ 5. In other words, contrary to Miller's allegation, the Jail has in place a set of policies and procedures designed to keep track of—and separate—inmates who should not be placed together. *Id.* ¶¶ 4-17. In addition, Miller concedes that inmates at the Jail can

"request to be placed on separation from other inmates." *Id.* ¶ 9. Thus, if Miller was inappropriately placed "in an unsupervised area with an inmate with a history of violence against other inmates," as he alleges, R. 78 at 18, that would not be the result of a policy or procedure at the Jail; it would be the result of negligence or some other conduct that was done *in violation* of the policy—for example, if Rothberg was wearing an orange wristband at the time and should not have been in the gym "unsupervised"[11] with Miller, as alleged. R. 40 ¶¶ 35-47; *see* R. 82, Exh. 1, 70:16-18 ("[I]f there was an orange wristband or a red wristband, . . . those [inmates] [would] be sent back to the housing area."). Such conduct is not the basis for a *Monell* claim. *See Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995) ("[P]roof of a single act of misconduct will not suffice; for it is the series that lays the premise of the system of inference."); *but see Johnson v. Cook County*, No. 12-2431, 2013 WL 2005236, at *4 (7th Cir. May 15, 2013) (unpublished) ("[I]n a narrow range of circumstances, a pattern of indifference might not be necessary to show deliberate indifference." (quoting *Connick v. Thompson*, ___ U.S. ___, 131 S. Ct. 1350, 1360-61 (2011) (internal quotation marks omitted))).[12]

---

[11] Whether Miller and Rothberg were "supervised" is another issue of contention between the parties. The Defendant Officers and Zaruba claim that Ushman at his post constitutes "supervision"; Miller's characterization of "unsupervised" is based on the fact no officer was physically present in the gym with Miller and Rothberg at the time of the attack. *See* R. 84 ¶ 10.

[12] The Court concludes that the allegations at issue are entirely distinct from the hypothetical situation described in *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989), as further discussed in *Connick*.

Miller's challenge essentially is to the fact *he* was allegedly housed with an inmate known to have "psychiatric problems and violent tendencies." However, Miller does not dispute that his placement in the 1-T administrative pod, an area imposing more restrictions on inmates, was the direct result of his own conduct and a court order entered on July 22, 2009. R. 80 ¶ 23; R. 84 ¶ 1. As the Seventh Circuit has explained, "[P]risons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more. Guards cannot turn away persons committed by the courts; nor do individual guards have any control over crowding and other systemic circumstances." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). That someone at some point may be in the vicinity of a potentially dangerous inmate does not constitute a widespread policy or practice of putting people together who should not be together or of being deliberately indifferent to an inmate's safety, s*ee Smith*, 715 F.3d at 191-94. That is the reality of being in a jail, which the Court is not in a position to micromanage. *See Al-Alamin v. Gramley*, 926 F.2d 680, 688 (7th Cir. 1991) ("[I]t is not the prerogative of the federal courts to micromanage the penal system of a state."); *Husnik v. Engles*, 495 Fed. App'x 719, 722 (7th Cir. 2012) (unpublished) ("[W]e are hesitant to micromanage a jail's intake procedures.").

Even taking all the facts and drawing all inferences in the light most favorable to Miller, Miller has not provided sufficient evidence upon which a jury could conclude that the Jail had a policy or practice of "forcing inmates without psychiatric or violent tendencies to be housed together with and to interact

unsupervised with inmates that are known to have psychiatric problems and violent tendencies" beyond which is unavoidable in a jail or the prison system. *See Smith*, 715 F.3d at 192-93 ("As a general matter, jail administrators are of course aware of the risks inherent in housing persons accused of different kinds of crimes together, but Smith has not shown that the Sheriff's Department ignored that risk in the design or implementation of the security classification policy. To the contrary, the record suggests that the classification policy is designed to mitigate that risk and respond to it if it arises."). And in any event, Miller is unable to demonstrate any alleged policy or practice was the "moving force" behind any constitutional violation complained of here.

Miller's third and fourth allegations are essentially the same—inadequate medical staffing—and both easily fail as well. The Court has already determined that the record does not support a conclusion that Miller suffered a constitutional violation as a result of Dr. Corcoran's treatment or any other medical care provided to him. That being the case, Miller cannot prove that any alleged policy or custom regarding medical staffing or treatment was the "moving force" behind a constitutional violation. *See Bd. of the Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). As Miller did not spend any time addressing these two allegations in his combined response to the motions, *see* R. 78 at 18-19, the Court need not elaborate further.[13]

---

[13] Miller does not dispute that "Dr. Corcoran is a licensed medical doctor and qualified to examine inmates for medical concerns at the DuPage County Jail." *See*

Allegation number five, that the Jail provided insufficient and inadequate staffing and training of Deputy Sheriffs in the gym control booth to effectively observe and control inmates, has some support. As described above, the parties do not dispute that the deputy assigned to Three Floor Control is responsible for overseeing and controlling the flow of traffic through the corridors through sliding doors and observing the inmates in the gym area. R. 84 ¶ 11. The parties also do not dispute that Deputy Ushman was the only deputy working the Three Floor Control post at the time of the incident. *Id.* ¶ 13. And Ushman testified to "one deputy man[ning] a post all day." R. 82, Exh. 12, 25:3-10. Taken together, a jury could conclude that it is a widespread practice or policy of the Jail to only have one deputy monitoring Three Floor Control at a time. Miller has cleared the first hurdle in establishing a *Monell* claim.

Having a policy or procedure is not enough on its own, however; a jury must be able to conclude that it was the "moving force" behind a constitutional violation. *See Kuhn v. Goodlow*, 678 F.3d 552, 557 (7th Cir. 2012) (explaining that liability will only attach if there is a "causal connection, or an affirmative link" between the conduct complained of and the party sued). In this case, it is undisputed that "[a]t any time the deputy assigned to Three Floor Control may need to direct his attention to inmates traveling in one of three hallways or to one of two gyms, *id.* ¶ 12, and a deputy is not always required to be "present in the gym with inmates," as opposed to observing from a floor control booth. R. 84 ¶ 10. This information could

R. 80 ¶ 48. This seems to directly contradict the two medical *Monell* allegations in his Amended Complaint. *See* R. 40 ¶ 56b-c.

support a jury finding that the Jail should have had additional personnel monitoring the area or standing in the gym or in the hallways, as it seems probable that if only one deputy is working the booth, that deputy could become distracted tending to another area or matter and, thus, be unable to recognize, prevent, or stop an inmate attack from occurring. This is especially true considering, first, the Defendants' concession that "Deputy Ushman could not see Mr. Miller [at the time of the attack] because of the placement of the intercom system in the gym and control room," *id.* ¶ 19, and, second, Ushman testified that as many as sixteen to twenty inmates were often in the gym at a time. R. 82, Exh. 12, 26:14-20. Relying on this information, a jury could find that the officers at issue would have acted differently—even if they acted appropriately at the time—had more of them been on duty or patrolling the area. These findings would support the "moving force" requirement because they would show that the staffing was not merely a "contributing factor" to the incident, but rather, the reason the Jail was unable to prevent the attack on Miller. *Cf. Thomas v. Cook Cnty. Sheriff's Dep't*, 588 F.3d 445, 457 (7th Cir. 2012) ("No one testified or even argued that the officers would have acted differently if more of them were on duty. How many officers would the Sheriff need to hire to ensure that no one deliberately ignores a complaint or medical request? We do not know.").

This is not to say that Miller will prevail at trial on allegation number five or that the Court believes the alleged policy of having one deputy in the booth is deficient. The Court is merely of the opinion that there is a genuine issue of

material fact as to whether the Jail's staffing as to the particular control booth and area at issue here was sufficient and whether any deficient staffing was the "moving force" behind the constitutional violation alleged. The jury may need to consider other county-level factors that affect staffing in a prison—e.g., overall funding, allocation of resources, the number of inmates, and the ability to offer additional training—which may have an effect on the merits. Additionally, any jury findings as to Counts I and II would likewise affect the validity of the under-staffing *Monell* claim because the jury could conclude, for example, that Ushman's intentional disregard of Rothberg's wristband color was the actual cause of the constitutional violation. In that case, any alleged staffing issue could not be considered the "moving force" behind the constitutional violation alleged. *See id.* at 458 ("So when individual officers are aware of, and make the conscious decision not to respond to, reports of an inmate's poor health, we cannot infer, without more evidence, that under-staffing was the *moving* force behind the resulting injury.").

In sum, the Court grants the Defendants' motion for summary judgment as to allegations one, two, three, and four under Count IV. Summary judgment as to allegation five is denied.

### E. Count V - Indemnification

745 ILCS 10/9-102 provides in relevant part:

A local public entity is empowered and directed to pay any court judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the matter provided in this Article.

In short, if a judgment is entered on Count IV against Zaruba in his official capacity as Sheriff of DuPage County, DuPage County would be liable for any judgment levied against Zaruba. Thus, because Miller has provided sufficient evidence to support his *Monell* allegation five under Count IV, the Court denies summary judgment as to Count V. *See Garret v. Dart*, No. 09 C 1398, 2010 WL 2136670, at *3 n.2 (N.D. Ill. July 8, 2010) ("[I]f Plaintiff's *Monell* claim survives, both the Sheriff and Cook County are necessary parties.").

### F. Defenses – Failure to Exhaust & Qualified Immunity

The Defendant Officers first contend Miller's claims must be dismissed because Miller has failed to exhaust his state remedies for purposes of the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). *See* R. 69 at 14-16. Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

The Court is aware of the grievances Miller filed prior and subsequent to the attack. *See* R. 82, Exh. 13. Nevertheless, the Court is not required to decide if the grievances Miller filed were sufficient to exhaust remedies while Miller was "confined in any jail, prison or other correctional facility." As Miller points out, he filed his Amended Complaint after he was no longer an inmate in custody—he was released in November 2009, R. 82, Exh. 9, 84:2-9; his Amended Complaint was filed on October 21, 2011. R. 40. Courts have held that the PLRA's exhaustion

requirements do not apply to an amended complaint filed after the prisoner-plaintiff is released from custody. *See, e.g.*, *Minix v. Pazera*, No. 06 C 398, 2007 WL 4233455, at *4-5 (N.D. Ind. Nov. 28, 2007) (citing *Barnes v. Briley*, 420 F.3d 673, 675-78 (7th Cir. 2005)). The Defendant Officers ask the Court to reverse or modify this body of law, R. 85 at 13-14, but the Court declines to do so. Accordingly, because Miller filed his Amended Complaint after he was no longer incarcerated, the Court denies the Defendant Officers' motion for summary judgment on this ground.

The Defendant Officers also argue in their reply brief that they are entitled to qualified immunity, contending that Miller has failed to provide any evidence of the deprivation of any clearly-established constitutional right. R. 85 at 14-15. But it is axiomatic that arguments raised for the first time in a reply brief are waived; thus, the Defendant Officers' qualified immunity argument is waived. *See United States v. Fluker*, 698 F.3d 988, 1004 (7th Cir. 2012).

Even if the Defendant Officers had properly raised the issue, the argument would still fail. Countless courts have found inmate on inmate violence as sufficient to constitute a deprivation of a clearly-established constitutional right, and the same is true in this case. *See, e.g.*, *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008) (explaining that a civilly-committed detainee's "protection against cruel and inhumane treatment has been defined as at least as extensive as that afforded to prisoners by the Eighth Amendment," which requires "humane conditions" and "adequate food, clothing, shelter, and medical care") (quoting *Farmer*, 511 U.S. at 832) (internal quotation marks omitted)).

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment as to Ryan, Bryant, Chavez, and Ireland on Counts I and II; they are thus dismissed from the case. Ushman and Cantwell's motion as to Counts I and II is denied. The Court grants Dr. Corcoran's motion as to Count III, and he is dismissed from the case as well. As to Count IV, the Court grants summary judgment in favor of Zaruba in his official capacity as to allegations one through four but denies summary judgment as to allegation five. And therefore, summary judgment is denied as to the Count V indemnification claim against DuPage County, Illinois. The Court also rejects the Defendants' qualified immunity defense.

This case was originally filed on October 12, 2010, nearly three years ago. Much of the delay is due to the pendency of this motion. Now that it is resolved, it is time for the parties to go to trial. A status conference is set for Friday, October 18, 2013, at 9:00 am. Lead trial counsel for both parties should be present to discuss their availability for a prompt trial in accordance with the summary judgment rulings.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: October 10, 2013